OPINION OF THE COURT
Frank A. Sedita, III, J.
Petitioners have brought a CPLR article 78 proceeding, which seeks to preliminarily and permanently enjoin any activity on the Chautauqua Institution’s amphitheater construction project, as well as to annul and set aside permits issued by the Town of Chautauqua Code Enforcement Officer. The pertinent background and procedural history are as follows.
The Chautauqua Institution (Cl) is a nonprofit adult education center and summer resort in the Town of Chautauqua, New York. Founded in 1874 and currently designated as a National Historic Landmark District, the Cl has established itself as a forum for the discussion of public issues, literature and science. Approximately 100 lecturers appear there annually. The Cl is also known as a home for the performing arts and offers courses in music, dance and theater, as well as the *731 visual and literary arts. Approximately 7,500 persons seasonally reside at the Cl, with approximately 100,000 annual visitors attending various events.
Much of the Cl’s educational and cultural activity is centered in and around its amphitheater. The first amphitheater was built at its current location in 1879. That structure was demolished in 1892 and rebuilt in 1893. The amphitheater has undergone 15 different renovations, modifications and structural improvements since then, including: installation of the Massey organ in 1907; construction of a new stage in 1923; widening of the backstage in 1954; and the addition of new steel support beams, construction of a new stainless steel roof and the addition of seating in the late 1970s and early 1980s. While its location and essential purpose has remained unchanged, substantial portions of the 1893 amphitheater have been either reconstructed or replaced over the past 123 years.
The Cl is governed by respondent Board of Trustees of the Chautauqua Institution (Board of Trustees). Its 24 members establish the policies and direction of the Cl, electing the officers who are responsible for its operation.
Land use within Cl’s campus is regulated by deed restriction, internal land use regulation and/or the original charter from the State of New York. In 1977, respondent Town Board of the Town of Chautauqua (Town Board) enacted the Town of Chautauqua Zoning Law as chapter 143 of the Code of the Town of Chautauqua. The Cl comprises as one of the Town’s nine zoning districts and is designated as the “C-I District.” Section 143-6 of the Town Code mandates continued compliance with a host of conventional building code regulations, but exempts the C-I District from the Town of Chautauqua’s zoning regulations.
In March 2008, the Town Board approved the Chautauqua Lake Local Waterfront Revitalization Program (LWRP), and shortly thereafter adopted chapter 141 of the Code of the Town of Chautauqua, the “Waterfront Consistency Law.” Pursuant to this chapter, whenever a proposed “action” is located in the waterfront area, an agency shall undertake an LWRP consistency review prior to approval. The LWRP lists 13 (mainly environmental) considerations, one of which is the preservation of historic resources.
So-called “minor actions” are exempted from LWRP consistency review. Pursuant to section 141-3 of the Code of the Town of Chautauqua, a minor action includes, “[replacement, *732 rehabilitation or reconstruction of a structure or facility, in kind, on the same site, including upgrading buildings to meet building or fire codes.” Minor actions also encompass, “[o]fficial acts of a ministerial nature . . . , including building permits where issuance is predicated solely on the applicant’s compliance or noncompliance with the relevant local building code.”
The local Waterfront Consistency Law appears to be modeled, in part, after the State Environmental Quality Review Act (SEQRA). That statutory scheme requires the preparation of an environmental impact statement on any “action” which might have a significant impact on the environment. Similar to the local law’s distinction between an “action” and a “minor action,” state law distinguishes between a “Type I action” (which triggers the environmental impact assessment process) and a “Type II action” (which does not). Pursuant to ECL 8-0105 and 6 NYCRR 617.5, Type II actions include, “replacement, rehabilitation or reconstruction of a structure or facility, in kind, on the same site, including upgrading buildings to meet building and fire codes” as well as, “official acts of a ministerial nature . . . , including building permits . . . where issuance is predicated solely on the applicant’s compliance or noncompliance with the relevant local building . . . code[ ]” (6 NYCRR 617.5 [c] [2], [19]).
Commencing in 2010, the Board of Trustees undertook a comprehensive effort to determine whether the amphitheater would be restored or replaced. In accordance with its 2010 strategic plan, an amphitheater study group was formed in 2011. Its purpose was to review issues central to the continued viability of the structure.
The Board of Trustees authorized further planning and solicited advice from a number of professional sources after receipt of the study group’s report. The Board of Trustees also retained experts, architects, engineers and consultants to prepare a design as well as to produce drawings and models for visual inspection by Cl residents and other interested parties. Indeed, input was repeatedly solicited from Cl residents and the general public throughout this five-year process, which included holding 27 community meetings in 2015 alone.
The Board of Trustees ultimately concluded that the current amphitheater could not be rehabilitated to meet the strategic and program goals of safety and accessibility, audience respect, artist/presenter respect and institutional sustainability. In an August 29, 2015 resolution, the Board of Trustees found that *733 demolition and reconstruction of the current structure, in accordance with the final construction plan, was necessary. A final resolution authorizing the amphitheater reconstruction project was passed on December 30, 2015.
At a privately funded cost of $41.5 million, the project results in increased functionality (e.g. the stage and orchestra pit will be expanded), floor space, and accessibility, particularly for the handicapped and aged. As a result of these and other modifications, the overall square footage and dimensions of the new structure are increased vis-a-vis the current one.
The reconstructed amphitheater would remain at its current location and the Massey organ, a prominent feature of the current structure, would be retained. Structural viability would be dramatically improved without sacrificing the essential character of the current structure; indeed, the shape, form, look and feel of the new structure would remain “very similar” to that of the old, according to the testimony of the Cl director of land use, design and building. Significant aesthetic features, such as the pitch of the roof and sense of the outdoors while seated inside, would remain essentially the same. The purpose of the amphitheater as the Cl’s educational and cultural anchor would remain unchanged.
On December 31, 2015, respondent Code Enforcement Officer for the Town of Chautauqua (CEO) issued building permits for the first phase of the amphitheater construction project. Construction contracts were executed on January 7, 2016 with construction activity slated to commence on February 1, 2016.
On January 26, 2016, petitioners asked this court to execute an order to show cause and issue an ex parte temporary restraining order (TRO), halting construction. The court initially denied the TRO and directed petitioners to place respondents on notice, making the matter returnable on January 29, 2016. After hearing from the parties on that date, the court issued a TRO, temporarily halting construction until the parties could be heard on whether a temporary injunction should issue. Arguments were heard on February 1, 2016 and a testimonial fact-finding hearing was held on February 8, 2016.
Petitioners advance three claims or theories supporting injunctive relief, all of which have a common theme and purpose: to delay the amphitheater construction project until there has been full compliance with a host of environmental and zoning regulations which, in their view, must be satisfied before any kind of construction activity could proceed. Petition *734 ers allege the governmental agencies acted unlawfully, arbitrarily and capriciously; specifically, petitioners claim that the CEO failed to conduct an LWRP consistency review in accordance with local law; that the CEO failed to comply with the environmental assessment process set forth in state law; and, that the Town Board unlawfully exempted the Cl from Town of Chautauqua zoning ordinances.
Petitioners’ contention that the Town Board unlawfully delegated its zoning authority to the Cl is without merit. (Matter of Rowe v Town of Chautauqua, 84 AD3d 1728 [2011].) The zoning ordinance and its amendments are clearly in accord with a well-considered, comprehensive plan for the benefit of the community as a whole (see Randolph v Town of Brookhaven, 37 NY2d 544, 547 [1975]; Matter of Town of Bedford v Village of Mount Kisco, 33 NY2d 178, 187-188 [1973]; Connell v Town of Granby, 12 AD2d 177 [1961]).
Petitioners’ contention that the CEO failed to conduct environmental reviews in accordance with LWRP and SEQRA present more nuanced issues for the court to resolve.
Both regulatory schemes—LWRP under the local Waterfront Consistency Law and SEQRA under the Environmental Conservation Law—seek to protect the environment. Both expansively define environmental protection to include resources of historical and aesthetic significance. Both, however, exempt “in kind” projects from the rigors of environmental review and carve out an exemption for non-discretionary, ministerial acts undertaken by a municipal officer issuing permits.
Respondents maintain the CEO does not have the authority or discretion to alter a project based upon environmental and historical considerations. His “sole mission” is to conduct a conventional review, i.e., to determine whether the project complies with health and safety regulations found in the State Building Code, making his duties ministerial in nature.
The issuance of a building permit is not always ministerial and courts cannot rely on a mechanical distinction between ministerial and discretionary acts alone (see Matter of Pius v Bletsch, 70 NY2d 920 [1987]). The issuance of a building permit may be predicated upon compliance with conventional building codes (and thus qualify as a ministerial act) or may instead compel the municipal officer or agency to conduct a more elaborate environmental review, depending on the regulatory scheme underlying the act (see Incorporated Vil. of Atl. Beach v *735 Gavalas, 81 NY2d 322 [1993]). The court’s decision in Historic Hornell, Inc. v City of Hornell Planning Bd. (19 Misc 3d 1108[A], 2008 NY Slip Op 50604[U] [2008]) is particularly instructive on this point.
Petitioners in the Hornell case brought an article 78 proceeding, premised upon noncompliance with both local and state law, for a judgment to annul and vacate a demolition permit issued for the destruction of a historic building located in a special area known as the “City of Hornell Neighborhood Overlay District” (2008 NY Slip Op 50604[U], *1). The underlying regulatory scheme was a local law which grafted an environmental compatibility review process onto projects in the Overlay District. That review process mandated consideration of four special criteria (in addition to compliance with conventional building considerations) before the municipal officer could issue a permit. Respondents argued they were exempt from conducting such a review because the issuance of the permit was a ministerial act. The court rejected this argument and held the municipal officer’s duties were discretionary in nature because the local ordinance mandated an additional compatibility review using the four special criteria.
Here, the Town of Chautauqua adopted a Waterfront Consistency Law, grafting the LWRP guidelines onto the permit issuing process. Relevantly, a project rising to the level of an “action” and when undertaken in the waterfront area (much like the Overlay District in the Hornell case) must first undergo an additional LWRP compliance review, which, in turn, would call upon the CEO to evaluate over a dozen environmental considerations. Accordingly, the CEO (unless otherwise exempted) is called upon to exercise discretionary duties when an action is to be undertaken in the waterfront area.
The Cl and its amphitheater are clearly within the waterfront area. This is not to say, however, that every construction project within that area must undergo an LWRP consistency review and SEQRA environmental assessment review.
Pursuant to the underlying regulatory scheme in this case, it is only when the waterfront area project constitutes an “action” that the CEO must consider environmental factors; that is what adds discretionary duties to his normally limited, ministerial ones. As previously noted, the underlying regulatory scheme also contains exemptions, relieving the CEO from considering environmental criteria. In such an event, the CEO *736 need only consider conventional building code criteria before issuing a permit.
Respondent urges that such an exemption also applies; specifically, that the amphitheater project is a “replacement, rehabilitation or reconstruction of a structure or facility, in kind, on the same site” and thus a “minor action.” If the amphitheater project is correctly classified as a “minor action” under the local law (and a corresponding Type II action under state law), issuing permits would correctly be characterized as a “ministerial act” of the CEO, thus exempting the respondents from the LWRP and SEQRA environmental review processes.
In order to constitute a replacement in kind, exact replication is not required. A replacement in kind will be effected if a new facility has a substantially similar use as the old facility (see Manhattan Val. Neighbors for Permanent Hous. for Homeless v Koch, 168 AD2d 262, 263 [1990]; Matter of Anderberg v New York State Dept. of Envtl. Conservation, 141 Misc 2d 594 [1988]).
The Board of Trustees undertook significant efforts to replicate the shape, form, look and feel of the current structure. The proposed amphitheater will have the same use and purpose as the current one and it is located in the same place. It therefore constitutes a “replacement, rehabilitation or reconstruction of a structure or facility, in kind, on the same site.” Accordingly, the CEO was and is exempted from conducting environmental reviews under state or local law. The issuance of the permits were correctly predicated on the applicant’s compliance with the relevant local building code, rendering the CEO’s duties ministerial in nature. In short, respondents acted properly in all respects.
In order to be entitled to a preliminary injunction, petitioners must show a probability of success, danger of irreparable injury in the absence of an injunction, and a balance of the equities in their favor. (Aetna Ins. Co. v Capasso, 75 NY2d 860 [1990].) The respondents did not act unlawfully, capriciously or arbitrarily, as alleged by the petitioners. Consequently, they have not shown a probability of success and their request for injunctive relief must be denied.
Respondents have made a motion to dismiss the petition (in lieu of filing a formal answer) and have addressed the merits of the petition in their dismissal motion. As previously stated, respondents acted lawfully and properly in all respects. *737 Because petitioners’ claims have been resolved in the respondents’ favor and as a matter of law, the petition is dismissed in its entirety.